UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

SHAUN WALTON,                          )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )        Cause No. 3:19-CV-1157-PPS
                                       )
ADRIANNE GORDON, *et al.*,             )
                                       )
        Defendants.                    )

**OPINION AND ORDER**

Shaun Walton was involved in a scuffle with correctional officers while he was

incarcerated at Westville Correctional Facility. [DE 32 (amended complaint); *see* DE 36

(screening order).] He claims his rights were violated during the altercation due to the

alleged excessive use of force and the failure to intervene by some officers who were on

the scene. In particular, Walton claims that Sgt. Adrianne Gordon and Correctional

Officer Jordan Hufford attacked him during an incident on October 30, 2018, and that

four other Correctional Officers (Officers Derek Moore, Ryan Tinsley, Azari Tatum, and

Christopher West) watched and laughed rather than intervene to stop Gordon and

Hufford from using excessive force. [DE 36 at 5.] Defendants now seek summary

judgment. [DE 150.]

Walton was convicted of felony battery against Officer Hufford as a result of the

same exact incident presently before the Court. *See generally State of Indiana v. Shaun

Walton*, Cause No. 46D02-1812-F6-1347. Walton is barred from relitigating facts

previously adjudicated in his battery trial. As a result, he cannot show a triable dispute

of material fact as to his excessive force claims. Moreover, under the circumstances presented, Defendants are entitled to qualified immunity on the excessive force claims. In sum, because no reasonable juror could find in Walton's favor, Defendants are entitled to summary judgment.

## Procedural Background

The amended complaint lays out Walton's theory of constitutional injury for purposes of his § 1983 claims. He claims that on October 30, 2018, he entered the recreation cage at Westville with his headphones on his head. [DE 32 at 3.] As he entered the recreation cage, Sgt. Gordon pushed him into the cage and asked him to turn around to be searched. Walton claims he refused to be searched by Sgt. Gordon. However, he allowed Officer Hufford to search him. Officer Hufford patted Walton down. In the process, Officer Hufford took the headphones off of Walton's head, causing them to snap. At that point, for seemingly no reason at all, Walton claims that Sgt. Gordon punched him in the face. Sgt. Gordon and Officer Hufford then allegedly forced him to the ground and handcuffed him, at which point Sgt. Gordon punched him, pulled his hair, and smashed his face into the ground.

This matter was previously assigned to Judge DeGuilio. In his screening order, Judge DeGuilio sized up the factual allegations in the amended complaint and determined that "while the evidence may ultimately demonstrate that the use of force was justified," at the pleading stage, Walton was entitled to the reasonable inference that Sgt. Gordon and Officer Hufford used force "not in a good-faith effort to maintain or

restore discipline, but maliciously and sadistically to cause harm," as required to state a claim for excessive force against the two officers. [DE 36 at 3–4 (citing *Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009)).] In addition, Walton sufficiently alleged facts from which one could reasonably infer that Sgt. Gordon and Officer Hufford's alleged actions lasted sufficiently long enough that other officers on the scene (Officers Moore, Tinsley, Tatum, and West) to have intervened to prevent the harm. *Id.* at 4.

Walton's amended complaint acknowledged that he faced criminal charges in LaPorte Superior Court based on the same incident, and that he was found guilty of a charge of aggravated assault against Officer Hufford. *See id.* at 4 n.3. *See generally State of Indiana v. Shaun Walton*, Cause No. 46D02-1812-F6-1347 (information dated Dec. 26, 2018). At the time he filed this civil action, an appeal was still pending and Judge DeGuilio assumed for screening purposes that his criminal conviction did not bar his claims. [DE 36 at 4 n.3.]

Early on in the case, defendants moved for summary judgment based on *Heck v. Humphrey*, 512 U.S. 477 (1994), asserting that a judgment in Walton's favor necessarily implied the invalidity of his criminal conviction for battery. [DE 61; DE 62 at 5.] In evaluating Defendants' arguments for dismissal pursuant to *Heck*, Judge DeGuilio considered whether the amended complaint contained "factual allegations that 'necessarily imply' the invalidity of [Walton's]' battery conviction." [DE 77 at 3–4 (citing *McCann v. Neilsen*, 466 F.3d 619, 622 (7th Cir. 2006)).] While acknowledging that the

amended complaint "may leave out certain facts," Judge DeGuilio was not persuaded that Walton's allegations necessarily implied that his battery conviction was invalid.

It should be noted that when Judge DeGuilio ruled on the original summary judgment motion he did not meaningfully delve into the facts of the related criminal proceeding – perhaps due to the threadbare record presented at that stage in the proceedings. In essence, the claims were permitted to go forward because the amended complaint did not deny that Walton assaulted Sgt. Gordon. Rather, while admitting that he had been charged and convicted for battery, Walton claimed that she and Officer Hufford used unreasonable force against him in response. Crediting the allegations in the amended complaint, Judge DeGuilio determined that Walton's claims did not necessarily imply the invalidity of his criminal conviction. Therefore, *Heck* was no bar to the lawsuit. *See id.* at 4 ("Walton's amended complaint may leave out certain facts, but it does not contain any facts which necessarily imply the invalidity of his conviction for battery against Sgt. Gordon.") (citing *McCann*, 466 F.3d at 622–23 and *Gilbert v. Cook*, 512 F.3d 899, 902 (7th Cir. 2008)).

After the close of discovery, the matter was reassigned to me. [DE 141.] At a telephonic scheduling conference, the parties brought me up to speed on the claims and discussed the filing of dispositive motions. Defendants confirmed that they intended to renew motions for summary judgment now that discovery had formally closed and a more robust factual record existed. Defense counsel specifically raised the issues of Walton's prior conviction, various admissions he had made in the course of his criminal

4

trial, and Defendants' entitlement to qualified immunity. Although Defendants had previously raised the *Heck* issue to Judge DeGuilio, I was persuaded that the overlapping criminal proceedings arising from the October 2018 incident—*i.e.*, the exact same situation forming the heart of this civil action—warranted further briefing before setting the case for trial. Therefore, over Walton's objections, I exercised my discretion to "allow an additional motion for summary judgment to be filed." [DE 149.]

### Undisputed Facts

With that backdrop, let's shift gears and size up the undisputed material facts in the record. [*See* DE 152 & Exh.; DE 154-1; DE 154-2; DE 155.] As noted above, Walton is a prisoner at Westville currently serving a sixteen-year sentence for beating a correctional officer and knocking him unconscious while he was being taken to the recreation yard in 2019, an event which occurred *after* the incident at issue in this case. *See generally Walton v. State*, 193 N.E.3d 403 (Ind. Ct. App. 2022) (table). A year earlier, Walton was involved in another dustup with correctional officers—the incident in this case—which resulted in a prior battery conviction. *See generally State of Indiana v. Shaun Walton*, Cause No. 46D02-1812-F6-1347; *Walton v. State*, 149 N.E.3d 700 (Ind. Ct. App. 2020) (table). It is this earlier battery conviction that forms the basis for Defendants' motion for summary judgment. [DE 150.] Defendants have provided certified transcripts of the proceedings, at which Walton testified in his own defense and Sgt. Gordon and Officers Hufford and Moore testified as witnesses for the state. [DE 152-2.] Walton does not contest the accuracy of any of the relevant testimony that follows. [*See* DE 154.]

5

In his own words, Walton testified that Officer Tatum was escorting him to the rec cage and "let [Walton] go," apparently thinking that "the next officer was supposed to grab [Walton]" as part of his secure transfer, which Walton confirmed was, in fact, the case. [DE 152-2 at 139, 143–44.] Officer West briefly escorted Walton before Sgt. Gordon "grabbed [Walton] aggressive[ly]," saying that she had told the officers not to "let him go." *Id.* at 144–45. Walton explained that he had a gunshot injury in his arm and that Sgt. Gordon "yanked" his arm aggressively while he was handcuffed. *Id.* at 146. Walton testified that he experiences pain in the arm "on and off," and that it often hurts when there is "[a]ny pressure on it," but noted "it's nothing that [he] can't handle." *Id.* at 146; *see id.* at 157. After Sgt. Gordon grabbed his arm, Walton testified that he "snatched away and went in the cage like you ain't got to grab me like that." Sgt. Gordon responded by "talk[ing] stuff to" him and threatening to pepper spray him. *Id.* at 146–47; *see id.* at 158. Walton "backpedaled" so that Sgt. Gordon could not "secure [him]." *Id.* at 147.

At that point, Walton recalled that Officer Hufford arrived in the rec cage. [DE 152-2 at 147.] Sgt. Gordon instructed Officer Hufford to perform a pat down, and again, Walton refused. *Id.* at 147–48. Walton "felt comfortable" with Officer Hufford and eventually let him perform the pat down, at which point Officer Hufford located a radio and workout gloves. *Id.* at 148–49. Walton told the jury that Sgt. Gordon was attempting to provoke him by being "verbally aggressive" while the pat down took place, but at that point there was no "physical confrontation" between him and the officers. *Id.* at 150. Walton put his back to the wall of the rec cage while Sgt. Gordon continued to verbally

berate him. *Id.* Walton testified that at this point, he attempted to speak to a Lieutenant; but Sgt. Gordon said "no" and told him, "I said give me your radio." *Id.* at 151–52. Sgt. Gordon then "snatched [the] headphone cord" and started forcing him to the ground. *Id.* at 152.

The headphones appeared broken, which made Walton "a little angry." [DE 152-2 at 153.] At this point, it seems like a full-on fracas ensued between Walton, Sgt. Gordon, and Officer Hufford in the rec cage. Walton told the jury that he responded by trying to "get Ms. Gordon off" of him – explaining that he made "some space between [himself and Sgt. Gordon]" by "*push[ing] off of her with [his] feet*." *Id.* at 152, 157 (emphasis added). Officer Hufford assisted in taking Walton to the ground, taking out Walton's "legs from under ]him]." *Id.* at 154. At some point in this process, Walton recalled that he grabbed hold of Officer Hufford's protective vest. *Id.* Walton acknowledged that he scratched Officer Hufford in the face during the ensuing scuffle; but he said that he did not realize it at the time, because he was "like a cat with his back against the wall, . . . trying to prevent them from harming me." *Id.* at 154–55. While none of the officers who testified at trial observed Walton with any physical injuries at the time, he testified that the altercation caused him suffer bumps on his head, scratches on his face, and a busted lip. *Id.* at 154. Walton's counsel repeatedly attempted to elicit any further details about what took place from his perspective. *Id.* at 154–56. Walton concluded by noting that he had apologized to both Sgt. Gordon and Officer Hufford. *Id.*

At his deposition in this case, Walton was asked about his claim that he "began to resist somewhat." [DE 120 at 42–43; *see* DE 32 at 4.] More specifically, Walton was asked whether he ever used his feet to try to get out from underneath Sgt. Gordon during their altercation. He responded that he resisted by "trying to move [his] body from [the officer], you know, abusing me." [DE 120 at 43.] In other words, he conceded that he "was resisting" the officers, by "pushing of with [his] feet," while insisting that he did not "recall kicking [Sgt. Gordon] or pushing off" of her with his feet. *Id.* at 43–45. Walton's trial testimony is consistent with his deposition testimony in this case. He plainly conceded that he used his lower body to separate himself from Sgt. Gordon (*i.e.*, he used force to continue resisting her orders), and that he scratched Officer Hufford's face while Officer Hufford attempted to stop him from resisting. As discussed further below, the key question for the jury to consider was whether Walton was justified in making contact with the officers in these ways under the circumstances.

Of course, as part of the state's case-in-chief, the jury also heard from the officers that responded to the incident (the same ones sued in this case). Sgt. Gordon observed that another officer, Officer Tatum, appeared to "release" Walton before he was secure in the cage, which did not comply with the facility's rules and procedures, so she proceeded to "grab[] ahold of Mr. Walton to make sure that he was escorted properly to the rec cage." [DE 152-2 at 31–33.] Sgt. Gordon observed that Walton had a "bulge in his left pocket," and as the pair got closer to the rec cage, she asked him "what he had in his left pocket." *Id.* at 32–34. Walton did not respond, so Sgt. Gordon told him that she "was

going to pat him down." *Id.* at 34. Walton then "sprang away from [Sgt. Gordon] and kicked [her]" in her leg. *Id.*

Sgt. Gordon then "went after" Walton, who was wearing handcuffs, in an attempt "to get him to calm down." *Id.* at 35. But this was unsuccessful. She told the jury that Walton violently resisted her attempts to get him to calm down – he "just continued to kick" her approximately 20 to 30 times. *Id.* at 34–36.

Sgt. Gordon recalled that Officer Hufford provided assistance "within seconds." [DE 152-2 at 36–37.] The pair attempted to calm Walton down "and get him compliant," and Sgt. Gordon instructed Officer Hufford to place Walton on the ground so that he would not be able to kick her anymore. *Id.* Initially, Officer Hufford placed Walton up against the "metal mesh" of the rec cage. *Id.* Walton was eventually brought to the ground "on his stomach" and "started screaming that his arm was hurt." *Id.* Sgt. Gordon was concerned about placing Walton "on his chest" because she did not want to put pressure on his breathing and wanted "to make sure his arm was okay." But immediately after Walton was brought to the ground, Sgt. Gordon observed that Walton "had ahold of Officer Hufford's stab vest." *Id.*

Sgt. Gordon testified that at no point in the process did either she or Officer Hufford kick Walton; rather, they only used physical force to "keep him from kicking." *Id.* at 38. While Walton was handcuffed, he had contorted his body such that his hand "was kind of twisted" and "he had ahold of [Officer Hufford's] vest," up by the collar. *Id.* at 38–39. At that point, as Officer Moore responded to the scene, Walton spit in Sgt.

Gordon's face. *Id.* at 39–40. Officer Moore was able to get Walton to release his hand from Officer Hufford's vest, at which point Walton's hand scratched Officer Hufford's face. *Id.* Sgt. Gordon further testified that at that point, she radioed for assistance and instructed officers to help Walton to his feet. *Id.* at 40. Walton continued "fighting the entire time," but after Officer Tinsley made it to the rec cage the officers were able to "reach into his pocket and get the item that was bulging" (a radio), which they confiscated before taking him to the hospital. *Id.* at 41. She recalled that the whole altercation took around four minutes, which was "a long time" in her experience. *Id.*

Officer Hufford's testimony is consistent with Sgt. Gordon's recollection of what transpired. He testified that he was escorting another inmate into a separate rec cage when he heard Sgt. Gordon screaming and ran to respond. [DE 152-2 at 78–79.] He saw Walton kicking Sgt. Gordon "multiple times." *Id.* at 78, 80. Officer Hufford "helped pin Walton up against the rec cage, the black mesh of the cage," and patted Walton down. *Id.* at 80. Officer Hufford "had a pretty good rapport with Walton" at the time, and Walton allowed him to perform the pat down. *Id.* Sgt. Gordon observed that Walton "had his headphones on," and instructed Officer Hufford to take them off. When he did, Walton "turned, and it broke the headphones," at which point Officer Hufford observed that Walton's "demeanor changed." *Id.* at 80–81. Walton "became visibly angry again, and then he lunged and tried to kick at Sergeant Gordon again." *Id.* 81. In response, the two officers "placed [Walton] on the ground." *Id.*

While Walton was still handcuffed, Officer Hufford explained that he had his "body contorted" and was able to grip his protective vest around the collar area. [DE 152-2 at 82.] Officer Moore responded to the scene and helped Officer Hufford unstrap his vest. *Id.* at 82–83. When the vest was unstrapped, Walton let go of the vest and scratched Officer Hufford in the face. *Id.* at 83. Officer Hufford disclaimed hitting or beating Walton in the course of the fracas. *Id.* at 84. Officer Moore, who also responded to the scene, provided another consistent version of what transpired, noting that he observed Walton kick Sgt. Gordon multiple times and did not see any visible injuries on Walton at the time. [DEE 152-2 at 107–09.]

After the close of testimony, the court instructed the jury on the law to be applied in the case. The parties disputed whether the evidence supported a self-defense instruction and the proper formulation of a self-defense instruction in the "prison environment," to the extent one was necessary. [DE 152-2 at 185–95; *see id.* at 194.] The court gave an instruction on the elements of self defense drawn from Indiana's pattern jury instructions. [DE 152-3 at 18.] The state had the burden of proving beyond a reasonable doubt that Walton did not act in self-defense consistent with this instruction. *Id.* The jury returned a verdict of not guilty as to a charge of felony battery against Sgt. Gordon and convicted Walton of felony battery against Officer Hufford. [DE 152-2 at 233.]

The October 2018 incident also gave rise to a disciplinary proceeding against Walton for battery on correctional staff. [DE 152-4; DE 152-5.] *See generally* Cause No.

11

ISP-18-11-0257 (hearing held Dec. 6, 2018). An IDOC report reflects that Walton

conceded that he "resisted" the officers and refused to give up his radio, in telling his

side of the story. Walton further asserted that he "didn't intentionally hurt" Officer

Hufford, while suggesting that the incident was Sgt. Gordon's fault because she "starts

stuff all the time." After a hearing, Walton was found guilty of battering both

correctional officers and faced disciplinary sanctions. [DE 152-5 at 1.]

Recall that Walton filed this civil suit before the appeal in his criminal case had

been resolved. On June 23, 2020, the Indiana Court of Appeals issued an unpublished

disposition dismissing his appeal. *Walton v. State*, 149 N.E.3d 700 (Ind. Ct. App. 2020)

(table). Citing to the trial transcripts summarized above, the Indiana Court of Appeals

stated the operative facts as follows:

> On October 30, 2018, Walton, a prisoner at the Indiana State Prison, was
> being transported from his cell to a recreational area. Sergeant Adrianne
> Ball was monitoring the situation and noticed that the officer transporting
> Walton had released Walton from his grasp. Sergeant Ball assumed the
> role of transporting Walton, at which point she discovered a bulge in his
> pocket. Once inside the recreational area, Walton slipped out of Sergeant
> Ball's grasp. Officer Jordan Hufford, who was nearby, heard Sergeant Ball
> scream for help and ran over to assist her. Officer Hufford then helped
> Sergeant Ball pin Walton down and conduct a pat-down search, which
> revealed workout gloves, a radio, and headphones on his person.
>
> Walton knew that prisoners could not take their headphones
> and/or radios with them from their cells to the recreational area, so
> Sergeant Ball ordered Officer Hufford to take those items from Walton. As
> Officer Hufford was doing so, he accidentally broke the headphones.
> Walton then became angry and lunged at Sergeant Ball. A scuffle broke
> out, during which Walton pushed Sergeant Ball to the ground and
> "gouged up" Officer Hufford's face.

*Id.* at *1.[1]

**Discussion**

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A motion for summary judgment has been described as the time in a lawsuit to "put up or shut up." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of *some* alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will

---

[1] The Court of Appeals decision refers to Sgt. Gordon as "Sergeant Ball." Between the October 2018 incident and the 2019 trial, Sgt. Gordon married and changed her last name to Ball. [DE 152 at 2 n.4.]

defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

I.    **The Preclusive Effect of Walton's Conviction and Trial Testimony**

It seems perfectly obvious that, factually speaking, Walton's prior criminal and disciplinary proceedings run parallel with his claims in this case. In that regard, Defendants argue that Walton should be estopped from rearguing the facts necessarily found against him in his criminal case.

Indeed, it is "well established that a prior criminal conviction may work an estoppel in favor of the government in a subsequent civil proceeding." *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 568–69 (1951) (collecting cases). As the Court in *Emich Motors* explained, the facts actually decided by a general jury verdict of guilty can be determined by reviewing the record in the criminal proceeding, "including the pleadings, the evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions of the courts." *Id.* at 569. *See also Askew v. Bloemker*, 548 F.2d 673, 679 (7th Cir. 1976) (noting court may consider "transcripts of testimony from [a defendant's] criminal trial" in ruling on a motion for summary judgment); *Cook Cnty. v. Lynch*, 648 F. Supp. 738, 741 (N.D. Ill. 1986) (considering testimony from defendant's criminal trial that supported the jury's guilty verdict on the time frame of alleged RICO enterprise, finding that the defendant was "collaterally estopped from relitigating the time frame during which she participated in the charged bribery scheme," and granting plaintiff summary judgment on the issue).

14

In assessing claims under 42 U.S.C. § 1983, federal courts must give "preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so[.]" *Allen v. McCurry*, 449 U.S. 90, 96 (1980). Thus, the "usual rules of preclusion apply in section 1983 actions," and courts in this circuit "apply the preclusion law of the state where the judgment was rendered, so long as the state in question satisfies the applicable requirements of the Due Process Clause." *Savory v. Cannon*, 947 F.3d 409, 418 (7th Cir. 2020). *See also, e.g., Brown v. City of Chicago*, 599 F.3d 772 (7th Cir.2010) (applying collateral estoppel in § 1983 excessive force case).

Under Indiana law, the doctrine of collateral estoppel "may bar the subsequent re-litigation of the same fact or issue which was necessarily adjudicated in a prior lawsuit." *Kimberlin v. DeLong*, 637 N.E.2d 121, 125 (Ind. 1994) (citing *Sullivan v. American Casualty Co.*, 605 N.E.2d 134, 137 (Ind. 1992)). Courts refer to "defensive" collateral estoppel where a defendant seeks to prevent a plaintiff from asserting a claim that the plaintiff has previously litigated and lost. *Small v. Centocor, Inc.*, 731 N.E.2d 22, 28 (Ind. Ct. App. 2000). For defensive collateral estoppel to apply, there must be (1) a final judgment on the merits in a court of competent jurisdiction, (2) an identity of the issues, and finally, (3) the party to be estopped must be the party or the privity of a party in the prior action. *Nat'l Wine & Spirits, Inc. v. Ernst & Young, LLP*, 976 N.E.2d 699, 704 (Ind. 2012) (citing *Small*, 731 N.E.2d at 28). I must also consider whether "the party against whom the judgment is pled had a full and fair opportunity to litigate the issue, and

15

whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel." *Id.*

Walton's contention is that Sgt. Gordon and Officer Hufford used exessive force during the October 2018 incident. A "core requirement" for a claim of excessive force in violation of Eighth Amendment rights is that the defendant "used force not in a good-faith effort to maintain or restore discipline, but maliciously and sadistically to cause harm." *Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). Courts in this circuit apply several factors to determine whether a correctional officer's use of force was legitimate or malicious under the circumstances, including: (1) the need for the use of force; (2) the relationship between the need for force and the force that was applied; (3) the threat reasonably perceived by the correctional officer; (4) any efforts to temper the severity of the force applied; and (5) the extent of the injuries suffered. *See id.* (quoting *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001)).

In light of the sworn testimony at his criminal trial and his resulting conviction, Walton is precluded from asserting facts necessary to present a triable dispute that Sgt. Gordon or Officer Hufford used force against him maliciously and sadistically to cause harm, rather than maintain discipline in the prison environment. This is fatal to all of his claims. After hearing the evidence at Walton's criminal trial, the state court found that it supported a jury instruction on self-defense. Thus, it was the prosecution's burden to negate the elements of self-defense beyond a reasonable doubt. As distilled in

the instruction given to the jury, the defense applies where an individual is justified in using reasonable force to protect himself from what he reasonably believes to be the imminent use of unlawful force by another person. However, an individual is not justified in using force if he "provokes unlawful action by another person with intent to cause bodily injury to the other person." Nor is an individual justified in using force if he has "entered into combat with another person or is the initial aggressor, unless he withdraws from the encounter and communicates to the other person the intent to do so and the other person nevertheless continues or threatens to continue unlawful action." *Weedman v. State*, 21 N.E.3d 873, 883 (Ind. Ct. App. 2014) (internal citation omitted).

The jury returned a guilty verdict on the count charging Walton with battery against Officer Hufford. In light of the jury instruction on self-defense, the jury had to consider whether the force used by Officer Hufford was lawful, whether his use of force (if deemed unlawful) was provoked, and whether his use of force (if initially justified) became unlawful because Walton stopped his assault of Officer Hufford. The jury's guilty verdict necessarily entailed the finding that Walton was not subjected to unlawful force when he gouged Officer Hufford's face, *or* that Walton was not acting in self-defense because he either provoked Officer Hufford to use force or because he was the initial aggressor or entered into combat with Officer Hufford and failed to withdraw. Either conclusion blows a hole through Walton's claim that Officer Hufford used excessive force under the circumstances. Walton had every opportunity to litigate the underlying factual issues at trial, and he did so. The jury just didn't buy his story.

17

Adding to this, Walton specifically testified to the effect that Officer Hufford did nothing malicious to hurt him. In fact, it was Walton himself who "made a sincere apology" to Officer Hufford after the incident because, as he put it, Officer Hufford "didn't deserve to" get hurt and he was, instead, "a victim of Ms. Gordon basically." [DE 152-2 at 155.] Because Walton is unable to present a triable dispute as to whether Officer Hufford used force not in a good-faith effort to maintain or restore discipline, but maliciously and sadistically to cause him harm, Officer Hufford is entitled to judgment on the excessive force claim.

But what about the separate charge of battery against Sgt. Gordon, of which Walton was acquitted? Walton's sworn testimony identified two instances in which Sgt. Gordon used force he viewed as excessive. But on a closer review, it is clear that no reasonable juror could view Sgt. Gordon's use of force as excessive under the circumstances.

First, Sgt. Gordon allegedly grabbed Walton by his arm to escort him to the rec cage. Recall that Gordon grabbed Walton by the arm for safety reasons – Officer Tatum had let Walton go without another officer taking control of him, which was against the facility's policy. Based on Walton's own trial testimony, there is no genuine dispute as to whether Sgt. Gordon, by grabbing his arm, applied force maliciously and sadistically to cause him harm. Even under Walton's version of events presented to the jury in 2019, it's clear that Sgt. Gordon grabbed his arm to maintain security in the prison environment, consistent with the prison's rules and procedures. Given the sworn

testimony provided by Walton at his criminal trial, I find that no reasonable jury could conclude that Gordon's act of grabbing Walton's arm amounted to anything more than a good-faith attempt to maintain discipline in the prison environment.

Second, Walton pointed to Sgt. Gordon's attempts to take him to the ground as Officer Hufford arrived in the rec cage. At the trial, Walton testified that he had intentionally evaded Sgt. Gordon's grasp when she attempted to escort him to the rec cage, that he continued to evade her once he was inside the cage so that she could not "secure [him]," and that he refused Sgt. Gordon's orders to stop evading her and submit to a pat down. [DEE 152-2 at 146–48.] These judicial admissions made by Walton reflect that he repeatedly attempted to evade Sgt. Gordon's attempts to secure him as he was escorted to the rec cage and after he "backpedaled" away from her into the rec cage. His statement that he "pushed off of [Sgt. Gordon] with [his feet]" is also consistent with the officers' testimony that Walton repeatedly kicked Sgt. Gordon as she attempted to secure him after he evaded her and "backpedaled" into the rec cage. [DE 152-2 at 153, 157; *see id.* at 30–31.]

In sum, based on Walton's own testimony, it is clear that Sgt. Gordon's attempt to take him to the ground was necessary to maintain security and safety in the jail environment. Sgt. Gordon reasonably perceived Walton to be a threat to her safety and the safety of her fellow officers, and she first took steps to quell that perceived threat short of attempting to take Walton to the ground (*i.e.*, repeatedly requesting that he submit to a pat down and stop resisting her orders). All of which completely

undermines the notion that her use of force was maliciously or sadistically designed to hurt Walton. Accepting Walton's testimony from his criminal trial, no reasonable juror could find otherwise.[2]

## II.    <u>Qualified Immunity</u>

There is another problem with Walton's excessive force (and by extension his failure to intervene) claims: Defendants are shielded from civil liability under the doctrine of qualified immunity. Qualified immunity is "an entitlement not to stand trial or face other burdens of litigation," meaning that it is an "immunity from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Under the doctrine, "[p]ublic officials are immune from § 1983 suits unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Culley v. Miller*, No. 22-3197, 2024 WL 2745785, at *1 (7th Cir. May 29, 2024) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)).

The "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)); *Davis v. Scherer*, 468 U.S. 183, 195 (1984). To be clearly established, the law must

---

[2] In order for Walton to prevail on his associated failure to intervene claim against Officers Moore, Tinsley, Tatum, and West, "it logically follows that there must exist an underlying constitutional violation." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (citing *Fillmore v. Page*, 358 F.3d 496 (7th Cir. 2004)). Because there is no triable dispute as to Walton's excessive force claim, it follows that he cannot pursue his derivative failure to intervene claim against these four other officers.

be "sufficiently clear" such that "every 'reasonable official would understand that what

he is doing' is unlawful." *Wesby*, 583 U.S. at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731,

741 (2011)). Qualified immunity thus "balances two important interests—the need to

hold public officials accountable when they exercise power irresponsibly and the need

to shield officers from harassment, distraction, and liability when they perform their

duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In sum, where, as here,

Defendants invoke the defense of qualified immunity, a plaintiff "must show both

(1) that the facts make out a constitutional violation, and (2) that the constitutional right

was 'clearly established' at the time of the official's alleged misconduct." *Abbott v.

Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). *See also Miller*, 2024 WL 2745785, at

*2 (on second prong, plaintiff "must identify a legal decision showing that the claimed

right as applied to [his] case was clearly established" at the time in question).

  In *Pearson*, the Supreme Court held that courts may grant qualified immunity

upon finding that a right is not "clearly established" by case law, without resolving "the

often more difficult question of whether the purported right exists at all." *Reichle*, 566

U.S. at 664 (construing *Pearson*, 555 U.S. at 227). Analyzing this second prong of the

analysis requires me to consider whether "the law was clear in relation to the *specific

facts confronting the public official when he acted*." *Volkman v. Ryker*, 736 F.3d 1084, 1090

(7th Cir. 2013) (emphasis added) (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir.

1987)). Applying this level of generality is particularly important in the context of

excessive force claims, as it is "difficult for an officer to determine how the relevant

legal doctrine . . . will apply to the factual situation the officer confronts." *Saucier*, 533

U.S. at 205. *See also Mullenix v. Luna*, 577 U.S. 7, 12 (2015)**.**

As discussed in the preceding section, based on what Walton himself testified to

at his criminal proceeding, I don't believe that any rational juror could find a

constitutional violation in this case. But even if there was arguably a violation, Walton

has failed to point to any case suggesting that under the circumstances presented (or

more generally, in a controlled prison environment), the force applied by Sgt. Gordon

and Officer Hufford was unreasonable. Case law teaches that where correctional

officers take measures to resolve a disturbance or maintain order in the prison

environment, the key question is whether "force was applied in a good faith effort to

maintain or restore discipline or maliciously and sadistically for the very purpose of

causing harm." *Whitley v. Albers*, 475 U.S. 312, 320 (1986) (internal quotation omitted).

*See also Hudson*, 503 U.S. at 7; *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010). The

Supreme Court in *Whitley* stressed that deference must be afforded to prison staff in

executing policies and practices needed to preserve order and institutional security. 475

U.S. at 321–22. *Accord Hudson*, 503 U.S. at 9 (not "every malevolent touch by a prison

guard gives rise to a federal cause of action").

It is clear in this case that the officers were responding to Walton's combative

behavior in a maximum security prison, which is a highly controlled environment. *Cf.*

*Duran v. Sirgedas*, 240 F. App'x 104, 118 (7th Cir. 2007) (noting "explosive nature of the

scene" where plaintiff bit officer and resisted arrest, finding officer acted reasonably

under circumstances in striking plaintiff on leg with an asp and once in head with his fist during arrest). Moreover, as previously discussed, it is irrefutable that the scuffle sprang from Walton's refusal to comply with Sgt. Gordon's lawful orders. Without reiterating all of the finer points set forth above, Walton conceded that he evaded Sgt. Gordon's lawful orders to submit to a pat down and give up his radio while being transported to the rec cage; then, he continued to use force to evade Sgt. Gordon and Officer Hufford as they attempted to restrain him.

In short, because Walton has failed to point me to any prior case showing that it was clearly established that the right to be free from excessive force exists in a circumstance similar to this case, the officers are all entitled to qualified immunity.

*     *     *

For the reasons explained in this Opinion and Order, Defendants' motion for summary judgment [DE 150] is **GRANTED**. The Clerk is **DIRECTED** to enter judgment for Defendants and against Plaintiff Shaun Walton.

**SO ORDERED**.

ENTERED: June 24, 2024.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT